Please be seated. Good morning. It's gonna say everyone, but we have one case on the calendar. I guess I could still say everyone. Uh, that case is Farman's Fund Insurance Company v One Beacon Insurance, and I believe we're ready to proceed. Uh, good morning, Your Honor's Adam Daugherty, uh, the appellate OneBeacon Insurance Company. Uh, I received I received one minute for rebuttal with my time here this morning, Your Honor's and subject. Your Honor's questions. I'd like to focus the court on the two primary legal errors that the district court made in allowing fireman's funds motion for summary judgment and denying one beacons crossboat. Uh, first, the district court applied. Follow the settlements to find one beacon to a post settlement allocation that is directly contradicted by the language of the fireman's fund policy and the reinsurance contract itself, which incorporates the exhaustion provisions of what we call policy three via the fall form policy in the reinsurance contract. And second, the district court failed to follow this court's holding in North River versus eight in which this court explained that a reinsured reinsured must allocate its actual loss for purposes of post settlement allocation and may not allocate based on its risk of loss. And that's what fireman's fund did here. Uh, I think it's worth emphasizing how narrow one of one beacons objection to the allocation is. This is not one beacon has never sought the type of de novo review that follows settlements prohibits. Instead, one beacons only objection to the allocation in this case is allocated any part of the settlement to policy three. And that's because the settlement was only for $35 million, which is a number that fits well within the combined limits of policies one and two, which is 40 million. May I ask you, um, do we start with the question of whether or not the policy requires exhaustion by payment? I mean, the suggestion has been made that that's not clearly stated in the policy. We've been pointed to other policies that do use such explicit language and that if that first question is not decided in your favor, that some of these other arguments you're making also become more problematic for you. Is that why is that not an appropriate way to look at this? To start with whether or not you've got an exhaustion by payment requirement? Your honor, I think there's two issues. The first is whether the language does require actual payment by the underlying insurer. And we submit that based on the language of the limit of liability provision, it does. The second issue is that I think even if we didn't have the exhaustion language that we do have, um, the court's decision in North River versus Ace provides an independent reason why this allocation does not work. So even if you put aside the issue of whether the exhaustion language requires actual payment in North River, we have the inverse of the situation we have here in North River. The season settled with its insured for $335 million, and that number fit within the second layer excess policies that the season North River issued to Owens Corning. And North River also issued higher layer policies. But because the loss, the $335 million settlement fit within the second layer excess policies, the court, I mean, I'm sorry, the season allocated all of the loss to that layer. Now, Ace, one of the re insurers on that layer objected to that allocation and said, Well, the season's pre settlement, uh, risk analysis indicated that the higher their policies were at risk. And therefore, the re insurer in that case argued that part of the settlement should have been allocated up to the higher layer policies, both because the pre settlement analysis indicated they were at risk and because the seeding of pain releases on those policies. Now, Mr Barrett, I interrupt for just a second. Am I right in understanding that North River wasn't interpreting an exhaustion requirement? Uh, North River did not. It was not specifically interpreting a exhaustion requirement, Your Honor. Um, it was. It was based on the how insurance excess insurance works. And in the settlement agreement, they're also unambiguously required the losses to be allocated to the lowest layer of insurance first. No, the allocation was based on the rising backup allocation, which is in the Wellington agreement. But that was not required in that case. That's what the season shows. That wasn't required. Okay, thank you. Um, so the and so what the court in North River explained is that although an insurer is free to, um, conduct any all manner of risk exposure analysis before settlement, and that risk exposure analysis will inform the decision whether to settle and at what amount to settle that risk exposure analysis is not lost. Um, once the once the insured and the insurer agreed to a settlement, that settlement number is the only loss. And this is important because reinsurance contracts are contracts of indemnity. One beacon did not agree to indemnify, um, fireman's fund for its risk exposure. What it may have had to pay if it didn't settle with the Sarko. It only agreed to pay or to indemnify fireman's fund for valid claims actually paid under policy free. And as the court in North River explained, if the if the settlement amount in an excess insurance situation, if the settlement amount fits within a lower layer, the risk to the higher layers is eliminated. The attachment point of policy three and of the reinsurance is 78 million. It's it's 25. It's attachment point is $25 million higher than the exhaustion point of policies one and two. Um, so therefore, under North River, the fireman's fund should have allocated the entire $35 million settlement to policies one and two. Can and if we disagree with you about the whether exhaustion is ambiguous is used in this provision and it's how and how to read the limitation of liability provision. Your argument is because of the precedent set in North River, we you still win. Am I understanding that correctly? That's correct, Your Honor. Fire. And that's because I'm sorry. Go ahead. No, no. Finish your answer, please. I was just gonna say that that's because the among other things, the attachment point of the policies would be ignored if the allocation was allowed to proceed in this manner, given the limits of the underlying policies. What I was going to ask is, if I understand it correctly, fireman's argues that your reasoning or your reading of North North River would basically require fireman's to sustain a $78 million loss. But um, add up to $60 million in coverage. They suggest that there's something, um, that that doesn't quite fit this case from North River. Um, do you want to respond to that contention on their part? I believe the contention was that, unlike in North River, the fireman's fund in a sarco did not agree to the total amount of loss. Uh, that's wrong, Your Honor. Uh, in in the North River case, the, um, the seeding and the insured agreed that the entire amount of loss under North River's all of North River's policies was $335 million. They did not agree that, um, that Owens Corning's entire loss was limited to $335 million. You see, here, go ahead, please. Here, the agreement between a sarco and and fireman's fund was that with respect to those three policies, they agreed that the loss is $35 million because those that loss fits within policies one and two. We submit that it has to be allocated to those policies. Otherwise, it turns the business of excess insurance on its head. But do agree that fireman's assessment was that there could be an insurance obligation of 53 million. And basically, what they did in settling was allocated so that, you know, would have been 20 million for the first policy, 20 million for the second policy and 13 for the third. So instead of being obligated for that policy when they when they essentially allocated it by that reasoning, they saved and you saved by the allocation that they made. And that would be what the follow the settlement principle would require us to honor. Isn't that right? I respectfully know your honor, because that's that's allocating based on a risk of loss and not an actual loss. So as in in North River, there was a risk that if fireman's fund did not settle, it would have to pay more money. But the fact remains that isn't risk loss always going to be what follow the settlement is about. No, follow the settlements is not about allocating on risk of loss. Follow the settlements is about deferring when the when an allocation is reasonable in good faith and not contradicted by the language of the policies. And that clearly and unambiguously requires payment by the underlying insurer. And in fact, fireman's fund in other cases, including the first state case, which is being argued right now down on the 15th floor of the courthouse, that solely by reason of losses paid there under their arguing that case, that means actual payment by the underlying insurer. And in this case, they try to say that that only applies to reduction, not exhaustion. But reduction and exhaustion are in the very same sentence. If that language means actual payment by the underlying insurer with respect to reduction, it has to mean the same thing with respect to exhaustion. And I see that my my time is up. Uh, I reserved my last minute if I if I could, Your Honors. Thank you. We'll hear from the athlete. Thank you. I take my mask off. Yes. Thank you. Mhm. Good morning, Your Honors. Steve Schwartz for Fireman's Fund. Um, I think I'll start with the North River argument, because that is clearly central to where one beacon is coming from. And I think it's important to keep in mind a few things about the North River case. First of all, if you if you go to the logic of the way that, um, that one beacon is trying to interpret it, one beacon is basically saying that in its in its settlement, we're sorry, in Fireman's Fund settlement with ASARCO, that that settlement effectively crystallized the insured loss at $35 million. And so it says under the rule of North River, there can't be an policies that Fireman's Fund issued to ASARCO. The trouble with that argument just logically is that the $35 million settlement between Fireman's Fund and ASARCO did not crystallize the insured loss at all. It doesn't have anything to do with the insured loss. What it does is settle Fireman's Fund's obligations. So $35 million is a loss to Fireman's Fund. It's not ASARCO's obligations under all three of its policies. That's why Fireman's Fund allocated a portion of the loss to each of those policies. And Judge Roger, you're correct. It did, it did save one beacon money. It saved one beacon money in a couple of ways. First of all, by settling for a favorable amount for everybody. And only if you would have, only if there would have been liability of $53 million. That, that's true. And, but I, if you look at the underlying settlement and you look at the years of, of, of litigation and of settlement negotiations that led up to it, I don't think there was any question that there was more than that. In fact, the, in, in the underlying settlement were, and also in the underlying coverage litigation, what, what Fireman's Fund did was make lots of arguments to say that the losses were never going to get up to the layers of its policies. But at the time that it settled, there were already something like $90 million of paid losses. And ASARCO, in connection with its bankruptcy, had contributed something like $900 million into the Asbestos Trust that was there to pay ongoing asbestos claims. So, and Fireman's Fund, in assessing its exposure, you know, had to take account of the fact that it had lost a series of defenses that would have potentially kept the losses at lower layers. It also spent lots of time analyzing detailed data that had been furnished by ASARCO into the nature of the, the asbestos losses. And so it had made a reasonable assessment that the losses were more than enough to exhaust its policies. In fact, the, the undiscounted exposure analysis showed something like, you know, 59 point something million dollars of exposure. So, so in other words, exhaustion almost of all three policies. So that was, you know, that was in the facts of the case. But so, so excuse me, just to make sure I understand. So the policyholders' loss is well beyond what Fireman's Fund ended up paying, is that right? Yes. Yes. So we're not talking about some speculative numbers? No. Yeah, okay. No, we're not talking about a speculative number. We are, I mean, certainly the $900 million that was contributed into the trust and the $90 million that had already been paid, those are not speculative numbers. There was, you know, there was going to be some period of time for losses to be paid out of the, the Asbestos Trust that was set up in the bankruptcy. And that's why, for example, the, the Fireman's Fund's exposure analysis did, incorporated a present value discount to reduce the loss from the 59 to roughly 50. So does that also help answer the question raised by the language ceased on by your opponent from Ali about the difference between indemnity policies and liability? Yeah, I think it does. I, I think that's right. Because in Ali, one of the issues was the concern for manipulation of settlements here. We have some fixed numbers. And, and also, by the way, in Ali, you know, the, the insurers were resisting payment. Here, the insurers did resist payment for quite a while, but eventually capitulated. I mean, eventually reached a compromise. So I do think it's a clear distinction between this case and Ali. I also would like to, you know, go on a little bit on North River. I know that one beacon places a lot of weight on North River, but it seems to me there are a couple of things you need to take into account there. One is that really the governing law on, governing New York law on allocation of settlements to reinsurers is not North River, but it's, it's the New York Court of Appeals decision in USF&G against Americanry. And I don't think there's any argument that this case is governed by New York law. That's addressed in footnote 11 of our brief. I haven't heard one beacon question that. And so I think if you're going to look at what the governing law is, I think you have to look at the USF&G case. And the USF&G case clearly said that insurers need only develop reasonable allocations. The test of whether an allocation is, is binding on the reinsurer is whether it's, is whether it's objectively reasonable. And the it's, could have been reached in an arm's-length negotiation between the insurance company and the policyholder. Well here, we've, we've written up in our briefs about the facts. I've discussed them a little bit, but there, there was an arm's-length negotiation between Fireman's Fund and ASARCO that led to the exposure analysis on which the allocation was, was based. So it seems to me that the facts show that the allocation was, in fact, based on the arm's-length negotiations between Fireman's Fund and ASARCO. But that argument does depend on this contract not requiring exhaustion by payment, right? Yes, I agree with that. Now, your adversary says no, this contract is clear in that regard. So you have to tell us why we shouldn't think so. I'm happy to do that. So here, you have to look at two different provisions of the Fireman's Fund policy. One is the payment of loss provision. The other is the limit of liability provision. The payment of loss provision is the, is the provision that, that explains when the policy attaches. And it, and it refers to exhaustion of underlying limits, but it says nothing about how those underlying limits are to be exhausted. The limit of liability provision talks about the reduction of an under, the reduction or exhaustion of an underlying aggregate limit. And the word aggregate limit is important because that comes into play when there are multiple losses, generally. And also what it says is if, if that underlying aggregate limit is reduced, and it does say by payment, but it said if that underlying aggregate limit is reduced by payment, in that case, the excess policy the Fireman's Fund wrote, effectively, the attachment point is reduced by the amount by which the underlying aggregate limit was reduced. What's important here, so two things to keep in mind. Number one, that wording does not say, it does say payment, but it does say, it does not say who has to pay. So in other words, it leaves open the possibility that those underlying losses can be paid by the policyholder or by the insurance company. So it doesn't, it doesn't tell you which one of those has to pay. Also, in the underlying settlement and coverage litigation between Fireman's Fund and ASARCO, there was no question about reduction of aggregate limits. Nobody was ever invoking that limit of liability provision. So it's, you know, it doesn't, it didn't come into play there. But so, and if I can just talk for a minute about those drop-down cases that Mr. Dougherty was just talking about. In the drop-down situation, so that's a special situation that occurs where an underlying insurer is insolvent. And in those situations, sometimes policyholders argue that an excess insurer, like Fireman's Fund, needs to basically drop down to replace the insolvent insurance. So Fireman's Fund, in that situation, if policyholders would write, were right, would be taking on the risk of, the solvency risk of all the underlying carriers. Well, not surprisingly, Fireman's Fund and lots of other insurance companies resist that. But one, but one thing that's important, I think, to keep in mind is that in those situations, Fireman's Fund is not saying that the insolvency of the underlying carrier is a get-out-of-jail-free card. They're not saying that because the insolvent carrier can't pay, it doesn't have to pay any loss at all. What it's saying is... It just has to reach the attachment point. Exactly, exactly. That's right. It has to reach the attachment point. But of course, if the losses are reaching the attachment point and an insolvent, a company underlying has gone insolvent, that means the policyholder is paying it. So Fireman's Fund interpretation of that language in those drop-down cases is consistent with what it's saying here. So I, so I don't think, I don't think that there's an exact way how this works and it shows the operation of the language in, you know, in Fireman's Fund's policies to allow payment by either the policyholder or the insurer to read, to rise up to the level of its policy. So in short, under whether you look at North River and I would add, by the way, I guess that's that. Complete that thought please. Okay. The, what I was going to say was that the, if you really took North River to be saying that, that a, sorry, a rising bathtub allocation is mandatory, that would be dictum. It would be inconsistent with the New York Court of Appeals holding in USF&G and I think what's required only is that our allocation, that Fireman's Fund's allocation be objectively reasonable and that test is clearly met here. Thank you. We'll hear rebuttal. Thank you, Your Honor. A couple things. First of all, the USF&G case itself acknowledges that a allocation cannot violate the terms of either the insurance contract or the reinsurance contract and goes on to exceed and it's insured agree to an allocation or a risk analysis. That does not make the post-settlement allocation reasonable. And I would add, Mr. Schwartz's reading of the limited liability provision reads out of the provision exhaustion as the district court did, but also Fireman's Fund acknowledges that pursuant to this language, there can be no drop-down. If a below-limit settlement, like they tried to allocate in this case, if a below-limit settlement requires policy three to drop down and start paying at 30, you're capped at 35 million or any part of the 35 million, you're effectively requiring that policy to drop down, which is exactly what Fireman's Fund says this language prohibits. Thank you both and we will take the matter under advisement. We only had one case on the calendar this